# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
TOZZI, CAMPANELLA, and PENLAND
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Staff Sergeant SAMUEL A. WRIGHT**
**United States Army, Appellant**

ARMY 20130296

Headquarters, United States Army Alaska
Stefan R. Wolfe, Military Judge
Colonel Tyler J. Harder, Staff Judge Advocate

For Appellant: Colonel Kevin Boyle, JA; Major Yolanda McCray Jones, JA; Captain Patrick A. Crocker, JA (on brief); Major Christopher D. Coleman, JA; Captain Patrick J. Scudieri, JA (on supplemental brief).

For Appellee: Major A. G. Courie III, JA; Major Steven J. Collins, JA; Captain Benjamin W. Hogan, JA (on brief); Colonel Mark H. Sydenham, JA; Major Steven J. Collins, JA, Captain Anne C. Hsieh, JA (on supplemental brief).

21 July 2016

----------------------------------
MEMORANDUM OPINION
----------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

CAMPANELLA, Senior Judge:

A panel of officer members sitting as a general court-martial convicted appellant, contrary to his pleas, of seven specifications of maltreatment of his subordinates, two specifications of larceny of military property, and one specification of reckless endangerment, in violation of Articles 93, 121, and 134 Uniform Code of Military Justice, 10 U.S.C. §§ 893, 921, and 934 (2006 & Supp. IV) [hereinafter UCMJ]. The panel sentenced appellant to be discharged with a bad-conduct discharge, to be confined for two years, to forfeit all pay and allowances, and to be reduced to the grade of E-1. The convening authority approved only so

much of the sentence as provided for a bad-conduct discharge, twenty months of confinement, total forfeitures, and reduction to E-1.[1]

This case is before us for review pursuant to Article 66, UCMJ. Appellant raises four assignments of error, two of which merit discussion and one of which merits relief.

## BACKGROUND

### A. Cruelty and Maltreatment

While deployed to Afghanistan, appellant served as an infantry squad leader. On 30 November 2011, appellant led his squad on a mission outside the command observation post (COP) area to an observation post (OP) located at a farmhouse approximately 400 meters away. Appellant's squad conducted the observation mission from atop the farmhouse roof. A set of mud stairs along one wall of the building allowed ingress and egress from their position.

After completing the mission, appellant threw a CS gas canister[2] on the roof of the OP during the exfiltration of his squad from that position. The first soldier on the roof in the path towards the stairs, kicked the canister to get away from it, but instead was greatly affected by the CS gas pouring out from the canister. In his confusion and affected physical state, the soldier panicked and blocked the stairway preventing others from leaving the area, thus prolonging the squad's exposure to the CS gas. Appellant stood at the bottom of the stairs and laughed as his squad scrambled to exfiltrate the rooftop. As a result of their exposure to the CS gas, several members of appellant's squad were temporarily unable to see or breathe. After gathering his squad and gaining accountability, appellant and his soldiers made their way back to the COP, some still feeling affected by the gas.

### B. Reckless Endangerment

At the end of the deployment, appellant stole six hand grenades and a package of C-4 explosives and covertly packed them inside a tuff box that was then loaded into a connex and shipped back to Fort Wainwright, Alaska, with the unit's gear and

---

[1] The convening authority reduced appellant's period of confinement by four months to provide relief for dilatory post-trial processing. The convening authority also waived automatic forfeitures for a period of six months and deferred adjudged forfeitures for the same six-month period for the benefit of appellant's family.

[2] CS gas, commonly referred to as tear gas, is used as a riot-control agent. Exposure causes a burning sensation, tearing of the eyes, mucous nasal discharge, disorientation, and difficulty breathing.

personal effects. An expert witness testified about the inherent risk of death or grievous bodily harm associated with the manner in which appellant had improperly transported explosive materials. Specifically, the expert testified that explosive material is sensitive to heat and friction. For transporting explosive material in this manner, appellant was convicted of reckless endangerment.[3]

## LAW AND DISCUSSION

### A. Cruelty and Maltreatment

On appeal, appellant argues the military judge erred in his instructions to the panel regarding Article 93, UCMJ, in that when a statute is silent as to intent, it must be read to require more than mere negligence, in accordance with the principles enunciated in *Elonis v. United States*, 135 S. Ct 2001 (2015). We do not find merit in appellant's contention.

Questions pertaining to the substance of a military judge's instructions are reviewed de novo. *United States v. Lopez de Victoria*, 66 M.J. 67, 73 (C.A.A.F. 2008); *United States v. Smith*, 50 M.J. 451, 455 (C.A.A.F. 1999).

In this case, when instructing the panel, the military judge stated maltreatment includes:

> [T]reatment that when viewed *objectively* and under all
> circumstances is abusive or otherwise unwarranted,
> unjustified and unnecessary for any lawful purpose, and
> the–and that results in physical or mental harm or
> suffering or reasonably could have caused physical or
> mental harm or suffering.

(emphasis added.).

It is a fundamental principle of criminal law that "wrongdoing must be conscious to be criminal." *United States v. Rapert*, 75 M.J. 164, 167 n. 6 (C.A.A.F. 2016) (quoting *Elonis*, 135 S. Ct. at 2009). The general rule is that a guilty mind is "a necessary element in the indictment and proof of every crime." *United States v. Balint*, 258 U.S. 250, 251 (1922). The Supreme Court has held that even when a *mens rea* requirement is not explicitly included in a criminal statute, that does not necessarily mean that such a requirement can be "dispens[ed] with." *Morissette v. United States*, 342 U.S. 246, 260 (1952). Rather, criminal statutes should be interpreted by courts as still including "broadly applicable [*mens rea*] requirements,

---

[3] The reckless endangerment charge was fashioned to only include transporting "an M67 hand grenade and a block of C-4 explosives."

even where the statute . . . does not contain them." *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 70 (1994). When inferring a *mens rea* requirement in a statute that is otherwise silent as to intent, courts must only read into the statute "that *mens rea* which is necessary to separate" wrongful conduct from innocent conduct. *Carter v. United States*, 530 U.S. 255, 269 (2000); *accord Rapert*, 75 M.J. at 167 n.6; *see also Elonis*, 135 S. Ct. at 2010.

In some instances, "the mere requirement in a statute that a defendant commit an act with knowledge of certain facts—i.e., that the defendant possessed 'general intent'–is enough to ensure that innocent conduct can be separated from wrongful conduct." *United States v. Caldwell*, 75 M.J. 276, 281 (C.A.A.F. 2016). The Court of Appeals for the Armed Forces (CAAF) has found that "there is no scenario where a superior who engages in the type of conduct prohibited under Article 93, UCMJ, can be said to have engaged in innocent conduct." *Id.* at 281. This is based on "the unique and long-recognized importance of the superior-subordinate relationship in the United States armed forces, and the deeply corrosive effect that maltreatment can have on the military's paramount mission to defend our Nation." *Id.*

"[T]he military must insist upon a respect for duty and a discipline without counterpart in civilian life. The laws and traditions governing that discipline have a long history [and] are founded on unique military exigencies as powerful now as in the past." *United States v. Heyward*, 22 M.J. 35, 37 (C.M.A. 1986) (quoting *Schlesinger v. Councilman*, 420 U.S. 738, 757 (1975)). The very lifeblood of the military is the chain of command. *United States v. Priest*, 21 U.S.C.M.A. 564, 570, 45 C.M.R. 338, 344 (1972) ("The armed forces depend on a command structure that at times must commit men [and women] to combat, not only hazarding their lives but ultimately involving the security of the Nation itself."). The corollary principle is that superiors must not maltreat their subordinates. Article 93, UCMJ, is intended to preserve the integrity of the superior-subordinate relationship. *See United States v. Dickey*, 20 C.M.R. 486, 488 (A.B.R. 1956).

Thus, the CAAF instructs, "a superior who voluntarily engages in objectively abusive conduct towards a subordinate cannot be heard to complain that his actions were protected by his freedom of speech, or that his actions were lawful in any other sense." *Caldwell* at 282 n. 8. "[B]ecause of the unique nature of the offense of maltreatment in the military, a determination that the Government is only required to prove general intent in order to obtain a conviction under Article 93, UCMJ, satisfies the key principles enunciated by the [United States] Supreme Court in *Elonis*. *Id*. at 278. Accordingly, the key question is whether appellant possessed general intent to undertake the conduct that either caused or could have caused suffering. *Carter v. United States*, 530 U.S. 255, at 269-70 (2000). The military judge's instruction comports with the standards articulated herein. We therefore conclude the elements of Article 93, UCMJ are satisfied.

*B.  Reckless Endangerment*

Appellant asserts factual and legal deficiency with regards to the means likely to produce death or grievous bodily harm, as contemplated by reckless endangerment, Article 134, UCMJ.  We need not reach this issue.

We instead examine the impact of our superior court's decision in *United States v. Gutierrez*, decided after appellant's trial.  74 M.J. 61 (C.A.A.F. 2015).

The elements for reckless endangerment under Article 134, UCMJ, are

> (1) That the accused did engage in conduct;
>
> (2) That the conduct was wrongful and reckless or wanton;
>
> (3) That the conduct was likely to produce death or grievous bodily harm to another person; and
>
> (4) That, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.

*Manual for Courts-Martial, United States* (2012 ed.) [hereinafter *MCM*], pt. IV, ¶ 100a.b.

At issue in *Gutierrez* was the third element:  the likelihood that certain conduct will produce death or grievous bodily harm.  *Gutierrez* 74 M.J. at 65.  The likelihood of death or grievous bodily harm involves measuring and balancing two factors:  "(1) the risk of harm and (2) the magnitude of the harm." *United States v. Dacus*, 66 M.J. 235, 238 (C.A.A.F. 2008) (quoting *United States v. Weatherspoon*, 49 M.J. 209, 211 (C.A.A.F. 1998)).  Before *Gutierrez*, the CAAF held that where the magnitude of harm is great, an act may be "likely" to cause death or grievous bodily harm even though the risk of harm is statistically low.  *Dacus*, 66 M.J. at 240.  In terms of the risk of harm, the CAAF repeatedly held the risk of harm need only be "more than merely a fanciful, speculative, or remote possibility." *Weatherspoon*, 49 M.J. at 211 (citations and internal quotation marks omitted).  But *Gutierrez* expressly overruled this standard for assessing the risk of harm. 74 M.J. at 68.  The CAAF instructs that the ultimate standard is whether the charged conduct was 'likely' to bring about grievous bodily harm." *Id*. at 65.

In this case, the military judge instructed the panel using the language overruled in *Gutierrez* concerning risk of harm:

> The likelihood of death or grievous bodily harm is determined by measuring two factors. These two factors are, one, the risk of harm, and two, the magnitude of harm. In evaluating the risk of harm the risk of death or grievous bodily harm must be more than [] *merely a fanciful, speculative, or remote possibility*. In evaluating the risk of harm, death or grievous bodily harm must be a natural and probable consequence of the accused's conduct, not merely a possible consequence of the accused's conduct. Where the magnitude of the harm is great, you may find that a reckless endangerment exists even though the risk of harm is statistically low. For example, if someone fires a rifle bullet into a crowd and a bystander in the crowd is shot, then to constitute reckless endangerment the risk of hitting that person need only be more than merely a *fanciful, speculative or remote possibility*, since the magnitude of the harm which the bullet is likely to inflict on that person is great if it hits the person.

In light of *Gutierrez*, we will set aside the reckless endangerment specification.

## CONCLUSION

The finding of guilty as to Charge IV and its specification is set aside and DISMISSED. The remaining findings of guilty are AFFIRMED.

In determining whether we can reassess the sentence, we apply several nonexhaustive factors:

> (1) Dramatic changes in the penalty landscape and exposure.
>
> (2) Whether an appellant chose sentencing by members or a military judge alone. As a matter of logic, judges of the courts of criminal appeals are more likely to be certain of what a military judge would have done as opposed to members. This factor could become more relevant where charges address service custom, service discrediting conduct or conduct unbecoming.
>
> (3) Whether the nature of the remaining offenses capture

the gravamen of criminal conduct included within the original offenses and, in related manner, whether significant or aggravating circumstances addressed at the court-martial remain admissible and relevant to the remaining offenses.

(4) Whether the remaining offenses are of the type that judges of the courts of criminal appeals should have the experience and familiarity with to reliably determine what sentence would have been imposed at trial.

*United States v. Winckelmann*, 73 M.J. 11, 15-16 (C.A.A.F. 2013) (internal citations omitted).

Applying these factors to this case, we are confident that reassessment is appropriate. First, we look to the penalty landscape. The maximum punishment is reduced from twelve years to eleven years. Second, although appellant was sentenced by a panel of officer members, we have experience dealing with similar cases. We are confident we can discern what punishment a panel would adjudge in this case. Third, the gravamen of the criminal conduct included within the original offenses remains substantially the same. Thus, neither the penalty landscape nor the vast majority of admissible aggravation evidence has significantly changed. Lastly, we have familiarity and experience with the remaining offenses to reliably determine what sentence would have been imposed at trial.

Reassessing the sentence based on the noted error and the remaining findings of guilty, we AFFIRM only so much of the sentence as provides for a bad-conduct discharge, eighteen months of confinement, total forfeiture of all pay and allowances, and reduction to E-1. We find this reassessed sentence is not only purged of any error but is also appropriate. All rights, privileges, and property, of which appellant has been deprived by virtue of that portion of the findings and sentence set aside by our decision, are ordered restored. *See* UCMJ arts. 58b(c) and 75(a).

Senior Judge TOZZI and Judge PENLAND concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court