UNITED STATES, Appellee,

v.

Paul J. FULLER, Sergeant,
U.S. Army, Appellant.

No. 00–0095.
Crim.App. No. 9701004.

U.S. Court of Appeals for
the Armed Forces.

Argued May 2, 2000.

Decided Sept. 11, 2000.

Sullivan, J., filed concurring opinion.

EFFRON, J., delivered the opinion of the Court, in which CRAWFORD, C.J., GIERKE, J., and COX, S.J., joined. SULLIVAN, J., filed a concurring opinion.

For Appellant: *Captain Jimmonique R. Simpson* (argued); *Colonel Adele H. Odegard, Major Kirsten V.C. Brunson,* and *Major Jonathan F. Potter* (on brief); *Major Scott R. Morris.*

For Appellee: *Captain Arthur L. Rabin* (argued); *Colonel Russell S. Estey, Lieutenant Colonel Eugene R. Milhizer,* and *Major Patricia A. Ham* (on brief); *Captain Kelly D. Haywood.*

Judge EFFRON delivered the opinion of the Court.

A general court-martial composed of officer and enlisted members convicted appellant, contrary to his pleas, of cruelty and maltreatment (3 specifications), rape, sodomy (3 specifications), indecent assault, unlawful entry, fraternization, and kidnapping, in vio-

lation of Articles 93, 120, 125, and 134, Uniform Code of Military Justice (UCMJ), 10 USC §§ 893, 920, 925, and 934, respectively. He was sentenced to a dishonorable discharge, confinement for 5 years, total forfeitures, and reduction to the grade of E–1. The convening authority approved the sentence as adjudged, and the Court of Criminal Appeals affirmed in an unpublished opinion.

On appellant's petition, we granted review of the following issue:

> WHETHER THE EVIDENCE IS LEGALLY SUFFICIENT TO SUSTAIN A CONVICTION FOR CRUELTY AND MALTREATMENT OF PFC M (SPECIFICATION 1 OF CHARGE II) WHERE PFC M TESTIFIED AND PROVIDED SWORN STATEMENTS THAT SHE VOLUNTARILY DRANK ALCOHOLIC BEVERAGES AND ENGAGED IN SEX WITH APPELLANT.

For the reasons set forth below, we find that the evidence is not legally sufficient to sustain appellant's conviction for cruelty and maltreatment, but is sufficient to sustain a finding of guilty for a lesser-included offense under the general article.

## I. BACKGROUND

At the time of the offenses, appellant and Sergeant First Class (SFC) Davis were members of the Inprocessing Training Center (ITC) at Darmstadt, Germany. As cadre members at the ITC, their mission was to assist soldiers and families transition into Europe. Soldiers would inprocess for approximately 2 to 3 weeks. While at the ITC, soldiers would engage in orientation activities such as German language training, driving training, and unit inprocessing. On December 8, 1996, Private First Class (PFC) M reported to the ITC, where appellant and SFC Davis were her platoon sergeants.

On December 27, 1996, PFC M and Private (PVT) I, another soldier at the ITC, celebrated PVT I's birthday with friends at the barracks. With the exception of PFC M, everyone drank shots of liquor. At some point that afternoon, appellant called the barracks looking for SFC Davis. While speak-

ing with PFC M, appellant asked what she and her friends were doing that evening. PFC M told appellant that they planned to go to the Rainbow Club that was located on base. Appellant asked if he and SFC Davis could join them at the club, and PFC M told him that they could do whatever they wanted.

At approximately 9:30 that evening, PFC M and PVT I and their friends went to the Rainbow Club. While there, PFC M drank four or five mixed drinks, consisting of whiskey and cola. At the club, appellant and SFC Davis approached PFC M and asked if she and PVT I wanted to go to an off-base club to further celebrate PVT I's birthday. PFC M told appellant that she would have to ask PVT I if she was interested. PVT I and PFC M went to the bathroom to secretly discuss whether they wanted to go to an off-base club with appellant and SFC Davis. Once they both had agreed, PFC M told appellant that they would like to go to the other club with him and SFC Davis. PFC M then "decided that [they] needed to make up something so that it didn't look so obvious to the other ITC people there that [they] were leaving. So [she] made up a story that [she and PVT I] were going to the barracks to call [PVT I's] mom because it was her birthday and she wanted to speak with her." PFC M made up the story "[s]o that it wouldn't look like [she and PVT I] were going out with members of [their] cadre."

In order to ensure that no one saw them leave together, appellant suggested that PFC M and PVT I leave the club before he and SFC Davis and wait for them at his car. PFC M and PVT I agreed and waited outside, in the cold, at appellant's car. After approximately 20 minutes, appellant came outside and let them into his car, but then he returned inside the club to find SFC Davis.

When appellant and SFC Davis finally returned to the car, they all drove off-base together. While driving, appellant and SFC Davis discussed the possibility that other cadre members might be at the other club. To avoid getting caught with two privates, they suggested that they go drink at appellant's off-base apartment. PFC M testified that

she and PVT I agreed to go back to appellant's apartment. On the way, they stopped at a gas station so that SFC Davis could buy a few bottles of liquor. While he was in the gas station, PFC M moved up to the front seat to sit next to appellant. When SFC Davis returned, he sat in the back seat with PVT I.

When they arrived at appellant's apartment, SFC Davis poured everyone a tequila shot to toast PVT I's birthday. Since the tequila was poured into regular glasses rather than shot glasses, each shot contained double the amount of tequila. Soon after they arrived, appellant left the room. While he was gone, PFC M and PVT I had approximately four to six of these double shots of tequila. PFC M testified that she "drank on [her] own that night" and that "nobody forced [her] to drink."

After drinking the tequila, SFC Davis asked PVT I to slow dance. While they were dancing, they started to take off each other's clothes. PFC M sat on the couch and was not "paying too much attention to them." By the time appellant returned to the room, SFC Davis and PVT I were already on the bed having sexual intercourse. Appellant and PFC M drank some shots of brandy, and soon thereafter they began kissing, got undressed, and started to have sexual intercourse. After a few minutes, appellant told SFC Davis, "You've gotta get some of this." Appellant then moved away from PFC M, and SFC Davis started having sex with her. At the same time, PFC M looked over at PVT I and saw appellant having sexual intercourse with her.

PFC M testified that she did not resist having sex with appellant or SFC Davis. She testified that at the time, she thought to herself, " '[W]ow,' and ... 'oh my gosh, I can't believe I'm having sex with him too.' " PFC M believes she blacked out for a few minutes because she does not recall when SFC Davis stopped having sexual intercourse with her, but she and appellant had sexual intercourse again. She testified that she did not move because she was very embarrassed.

Appellant then asked her if she had ever had anal intercourse. At trial, PFC M testi-

fied that she did not recall what she said to appellant, but she remembered that the anal sex hurt. She twisted away and rolled over on her back and they had vaginal intercourse again. At trial, PFC M testified that on the night of December 27, she had "willingly engaged in sex with [appellant]" and that "he had [her] permission." She did not say "no," nor did she attempt to stop the sexual activities. PFC M testified that although she did not actually want to have sexual intercourse with appellant or SFC Davis, she did not indicate that to either of them.

The following morning, PFC M told appellant that she and PVT I wanted to go back to the barracks. On the way back to base, the four of them joked in the car and stopped to eat lunch together. PFC M testified that neither she nor PVT I were upset that morning. PFC M testified that after she got home, she did not tell anyone about what had occurred. She tried to forget about the evening because she was not proud of herself.

PFC M did not see appellant again until approximately 11:00 p.m. on February 5, 1997, when she awoke to him knocking at her door. Appellant asked her to come outside so that he could speak with her. PFC M got dressed, went downstairs, and got into appellant's car. SFC Davis was on the passenger side of the front seat. After PFC M got into the car, appellant drove to a nearby parking lot and parked the car.

SFC Davis told PFC M that he had just been interviewed by a Criminal Investigation Division (CID) agent regarding allegations made by several female soldiers against him, and he asked her if she knew anything about it. When she told him she did not know about the allegations, appellant told PFC M not to say anything to CID and that they "needed to get a story together, so it would [look] like [they] were all telling the truth." SFC Davis told PFC M what to say to the CID agents. PFC M agreed to tell CID what he told her because she "didn't know if they would let [her] out of the vehicle." She

testified that she just wanted to get out of appellant's vehicle and go home.

Appellant subsequently was charged with and convicted of several offenses, including maltreatment of PFC M for "having sexual relations with her after she became extremely intoxicated and sexually harassing her in that he made a deliberate offensive comment of a sexual nature."[1]

Appellant challenges the legal sufficiency of this conviction. His convictions for rape, sodomy, unlawful entry, and fraternization are not at issue in this appeal.

## II.  DISCUSSION

◼ In considering whether the evidence is legally sufficient to sustain appellant's maltreatment conviction, we must "view[ ] the evidence in the light most favorable to the prosecution" and determine whether "*any* rational trier of fact could have found the essential elements of [maltreatment] beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

The elements of cruelty and maltreatment are "(1) that a certain person was subject to the orders of the accused;  and (2) that the accused was cruel toward, or oppressed, or maltreated that person." Para. 17b, Part IV, Manual for Courts–Martial, United States (1995 ed.).[2]  Paragraph 17(c)(2) explains that

> the cruelty, oppression, or maltreatment, although not necessarily physical, must be measured by an objective standard. Assault, improper punishment, and sexual harassment may constitute this offense. Sexual harassment includes influencing, offering to influence, or threatening the career, pay, or job of another person in exchange for sexual favors, and deliberate or repeated offensive comments or gestures of a sexual nature.

◼ Appellant's conviction for maltreatment was based primarily on evidence of consensual sexual relations between appellant and PFC M, a female soldier in his

---

1.  Appellant was convicted of this specification by exceptions and substitutions made by both the military judge and the members.

2.  This provision is unchanged in the current version of the Manual.

inprocessing unit. "Art. 93, UCMJ, however, is not a strict liability offense punishing all improper relationships between superior and subordinates." *See United States v. Johnson*, 45 MJ 543, 544 (Army Ct.Crim.App.), *pet. denied*, 48 MJ 345 (1997). Although appellant's actions clearly would support a conviction for violating the Army's prohibition against improper relationships between superiors and subordinates,[3] that alone does not support a conviction for the offense of maltreatment.

The evidence demonstrates that PFC M was a willing participant in the sexual relations she had with appellant. From the outset, PFC M wanted to leave the club with appellant. It was PFC M's idea to lie to the other members of the ITC so that no one would know that she and PVT I were leaving with appellant and SFC Davis. PFC M also agreed to stand in the cold at appellant's car for approximately 20 minutes, while appellant remained in the club.

Once in the car, PFC M specifically agreed to go back to appellant's off-base apartment rather than the off-base club. She also purposely moved up to the front seat to sit beside appellant when SFC Davis went inside the gas station to buy liquor. When they arrived at appellant's room, PFC M drank approximately five or six double shots of tequila of her own volition. She testified that appellant was not in the room when she consumed the alcohol.

When SFC Davis and PVT I started undressing in front of her, PFC M did not leave the room. By the time appellant returned, SFC Davis and PVT I already were having sexual intercourse on the bed. Once appellant returned, PFC M testified that she and appellant drank more shots, started kissing, and got undressed. She admitted that she had consensual sex with appellant.

Although she testified that at times she felt embarrassed, she never indicated that appellant's rank influenced her decision to consent to sexual intercourse with him. There is no evidence that appellant used or threatened to use his position as a cadre member to coerce PFC M into having sexual intercourse with him. In fact, during her testimony PFC M did not indicate that she felt intimidated by appellant due to his position as her platoon sergeant or that he influenced or threatened to influence PFC M's career in exchange for sexual favors.

■ We are sensitive to the fact that appellant was a superior noncommissioned officer, and PFC M's platoon sergeant, and that such a relationship can create a "unique situation of dominance and control." *See United States v. Johnson*, 54 MJ 67, 69 (2000), citing *United States v. Clark*, 35 MJ 432, 436 (CMA 1992). Based upon the record in this case, however, there is no indication that PFC M felt unable to resist appellant's actions. She testified that she did not feel threatened by appellant the entire evening. Since PFC M was an ITC member for only a few weeks while transitioning into Europe, there was no evidence that the inherently coercive nature of a typical training environment was present here or a factor in PFC M's decision to enter into a consensual sexual relationship with appellant.

With regard to her drinking, the record does not establish that PFC M showed any visible signs of intoxication. She testified that before arriving at appellant's apartment, she and PVT I were carrying on conversations, were walking on their own, and were "acting normal." Although PFC M testified that she consumed several shots of tequila after she arrived at appellant's apartment, he was not present during that time. In response to one question from a member, PFC M indicated that she thought appellant and SFC Davis had abused their position with her and PVT I because they "were there and [they] were drunk." This statement alone does not support a conviction for maltreatment. The Government failed to present evidence that appellant knew PFC M was "extremely intoxicated" when they had sexual intercourse or that by having sexual intercourse with her he committed maltreatment.

---

**3.** The Army's most recent fraternization regulation punitively prohibits a wide range of inappropriate relationships between superiors and subordinates. *See* AR 600–20, para. 4.14 (15 Aug. 1999).

Accordingly, we find the evidence legally insufficient in this respect. *See Jackson v. Virginia, supra.*

■■ With regard to the sexual harassment allegation, we conclude that appellant's comment to SFC Davis did not constitute maltreatment. Although sexual harassment can constitute maltreatment, *see* para. 17c(2), Manual, *supra,* appellant's comment to SFC Davis, in this context, does not support a finding of maltreatment by sexual harassment. PFC M did not indicate that the comment offended or harassed her. Instead, she testified that after appellant made the comment and SFC Davis started to have sexual intercourse with her, she thought to herself, " '[W]ow' and ... oh my gosh, I can't believe I am having sex with him too." The Government presented evidence that this comment embarrassed PFC M, but embarrassment does not support a finding of maltreatment by sexual harassment. In other contexts, a comment of this nature might well support a finding of maltreatment. However, considering the facts and circumstances surrounding the making of appellant's comment, we conclude that the evidence is legally insufficient to support a maltreatment conviction for that comment.

■ Our holding that the evidence is legally insufficient to support a conviction for maltreatment does not end the analysis. This is because the evidence establishes that appellant's conduct constitutes a lesser-included offense under Article 134, UCMJ, 10 USC § 934. *See United States v. Sapp,* 53 MJ 90 (2000)(the lesser-included offense of a simple disorder affirmed when the record did not support a finding of guilty for the greater offense); *see also United States v. Augustine,* 53 MJ 95 (2000); Art. 59(b), UCMJ, 10 USC § 859(b) ("Any reviewing authority with the power to approve or affirm a finding of guilty may approve or affirm, instead, so much of the finding as includes a lesser-included offense.").

■ Conduct is punishable under Article 134 if it is prejudicial to good order and discipline in the armed forces or is of a nature to bring discredit upon the armed forces. We have no doubt that appellant's conduct, including sexual relations with PFC M and encouragement to SFC Davis to have sexual intercourse with her, was prejudicial to good order and discipline or service discrediting. *See United States v. Tollinchi,* 54 MJ 80 (2000) (sexual intercourse is "discrediting" when participants know a third person is present). We note that appellant was clearly on notice of this lesser-included offense because every enumerated offense under the UCMJ is *per se* prejudicial to good order and discipline or service-discrediting. *See United States v. Foster,* 40 MJ 140, 143 (CMA 1994).

In light of the remaining offenses and the evidence in this case, we are convinced beyond a reasonable doubt that the error with respect to the dismissed offense was not prejudicial as to the sentence and we affirm.

## III. CONCLUSION

The decision of the United States Army Court of Criminal Appeals is reversed as to the greater offense of maltreatment under specification 1 of Charge II, but affirmed as to the lesser-included offense of a simple disorder under Article 134 and in all other respects.

SULLIVAN, Judge (concurring):

Appellant was found guilty of the following offense, in violation of Article 93, Uniform Code of Military Justice, 10 USC § 893.

CHARGE II: VIOLATION OF THE UCMJ, ARTICLE 93

SPECIFICATION I: In that SGT Paul Fuller, U.S. Army, at Babenhausen, Germany, on or about 28 December 1996, was cruel toward, and did oppress and maltreat PFC [M], a person subject to his orders, [by] *having sexual relations* with her after she became *extremely intoxicated* and *sexually harassing* her in that he made deliberate or repeated offensive comments of a sexual nature.

(R. 699, App. Ex. XXXIII).

The question before us is not whether this specification as noted above fails to state a criminal offense. *See* RCM 907(b)(1)(B) and 307(c)(3), Manual for Courts–Martial, United

States (1995 ed.). It does. *See* para. 17c (2), Part IV, Manual, *supra* (assault, improper punishment, and sexual harassment may constitute this offense). The question before us is whether there was sufficient evidence admitted at appellant's court-martial for a reasonable factfinder to find beyond a reasonable doubt that the charged offense as alleged occurred. *See Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

I agree that there was no evidence presented in this case that appellant "sexually harassed" the alleged victim, a junior enlisted person. *See* para. 17c (2), *supra* ("sexual harassment includes influencing, offering to influence, or threatening the career, pay, or job of another person in exchange for sexual favors, and deliberate or repeated *offensive* comments or gestures of a sexual nature.") (emphasis added). The absence of evidence of coercion on the basis of rank removes this case from the scope of Article 93, UCMJ, 10 USC § 893. This record shows only consensual sex between a noncommissioned officer and a private who were *both* extremely intoxicated.